BRADY, Justice:
The National Bank of Commerce of Columbus, hereinafter called appellee or the Bank, filed a bill of attachment in the Chancery Court of Lowndes County against the non-resident defendant, Gordon R. Brent, hereinafter called appellant or Brent, and several residents. The Bank’s claim was based upon an instrument entitled “Continuing Guaranty” hereinafter referred to as the “contract” executed by Brent in consideration for credit to be extended to one Leon Kesler by the Bank. The contract was in favor of the Bank of Brooksville which merged with The National Bank of Commerce of Columbus in 1968. The court held that the contract was one of guaranty, not suretyship or accommodation, and that Brent was liable to the Bank for the guaranteed sum of $21,140.21 together with all accrued interest thereon and reasonable at *432 torney’s fees. From that judgment Brent perfects this appeal.
Leon Kesler farmed property in Lowndes County belonging to the appellant, Gordon R. Brent, and one Everett H. Brooks and was a tenant of said persons. Kesler could not obtain a loan from the Bank for the operation of the farm for the year 1967. An open line of credit with the Bank not to exceed $65,000 was established for appellant’s tenant, Mr. Kesler, solely because of the written contract which Brent and Brooks executed in April 1967. The contract, which enabled Kesler to obtain an open line of credit at the Bank so that he could farm the 3,000 to 4,000 acres of land belonging to appellant, provides as follows:
CONTINUING GUARANTY
In Consideration of BANK OF BROOKSVILLE, BROOKSVILLE, MISSISSIPPI, giving or extending credit to Leon Kesler, Crawford, Miss, hereinafter called “debtor”, I hereby give this continuing guaranty to the said Bank of Brooksville, Mississippi, hereinafter called “Bank”, its transferees or assigns, for the payment in full, together with all interest, attorney fees, other fees, and charges of whatsoever nature and kind, of any indebtedness, direct or contingent whether secured or unsecured, of said debtor to said Bank up to the amount of Sixty Five Thousand and no/100 (65,-000.00) Dollars, whether due or to become due, and whether now existing or hereafter arising. The Bank may, one or more times in its judgment, grant extensions, take and surrender securities, accept compositions, release or discharge in-dorsers, guarantor’s (sic) or other parties, grant releases and discharges generally, make changes of any sort whatever in the terms of its contract or manner of doing business with the debtor and with other parties and securities in relation thereto without notice to the undersigned, such notice being hereby specifically waived. The Bank may, without any notice to or consent of the undersigned, also apply all moneys received from the debtor and others, or from securities, as it may think best, without in any way being required to marshal securities or assets, and any such application of moneys shall not in any way alter, affect, limit or lessen the liability of the undersigned under this Guaranty. The Bank shall not be bound to exhaust its recourse against the debtor or .other persons or upon the securities it may hold before being entitled to payment from the undersigned of the amount hereby guaranteed. I do furthermore bind and obligate myself, my heirs and assigns, jointly and severally with said debtor, for payment of the said indebtedness precisely as if the same had been contracted and was due or owing by me in person, hereby agreeing to and binding myself, my heirs and assigns, by all terms and conditions contained in any note or notes signed or to be signed by said debtor, making myself a party thereto; hereby waiving all notice including notice of any such indebtedness and of demand, presentment, protest or notice of demand or non-payment and of notice of any act to establish the liability of any party on any commercial or other paper, indebtedness or obligation covered by this guaranty; I do further waive all notice and all pleas of discussion and division and I agree upon demand at any time, to pay to said Bank, its transferees or assigns, the full amount of said indebtedness up to the amount of this guaranty, together with interest, fees and charges, as above set forth, becoming subrogated in the event of payment in full by me to the claim of said Bank, its transferees or assigns, together with whatever security it or they may hold against said indebtedness.
In the event this Continuing Guaranty is executed by more than one individual, it is understood and agreed that each individual shall be bound by all of the provisions of this continuing guaranty and for the payment in full of the entire amount stated above, in the same *433 manner as if each individual were the only person executing this continuing guaranty. It is also understood and agreed that this continuing guaranty does not supersede nor cancel any preexisting guaranty or guaranties given by any of the undersigned on behalf oí the borrower named above but to the contrary shall be in addition thereto.
It is expressly agreed that this continuing guaranty is absolute and complete, and that acceptance and notice of acceptance thereof by the Bank are therefore unnecessary and they are hereby expressly waived, and the same shall continue in force until written notice of its discontinuance shall be delivered to one of the executive officers of the said Bank, but such discontinuance shall not affect my liability on any debts and/or obligations of the debtor then existing nor the liability of any other party in the premises.
Witness our signatures this - day of April, 1967.
/s/ Everett H. Brooks
/s/ Gordon Brent
Kesler apparently failed to make payments on his account, so on April 20, 1968, the Bank informed Brent that Kesler’s account was past due. In a letter dated May 1, 1968, Brent pleaded with the Bank to indulge the said debt. In that letter Brent further stated that:
. . . Mr. Kesler is getting his financing for this year with the FHA and is number one on the list and has been assured by them that the money will be forthcoming at once. We agreed with him early to work out with him any money that he had to borrow from your bank, and rest assured that Mr. Everett H. Brooks and I are working with and for Mr. Kesler in every way we can.
Several weeks later three notes were executed by Kesler wherein the Bank loaned him $17,190.91. On March 3, 1969, the Bank renewed a note for $1,113.36, making it due in six months.
On April 8, 1969, Brent canceled the contract by letter, stating:
We continue to work on Mr. Kesler’s problems and will keep the bank informed of our progress. In the meantime so we will know exactly where we stand, we are cancelling all open commitments to Mr. Kesler and will review each advance of funds as their need arises.
At the time of this cancellation of the open commitment, the guaranteed amount of the indebtedness was $21,140.21, consisting of the $17,190.91 debt, less a $1,000 payment on account, plus the renewal note in the amount of $1,113.36 and an overdraft of $3,835.94.
On May 19, 1969, Brent wrote the Bank that the notes could not be paid at that time; that there never had been a definite due date indicated; that the Bank had indicated it would go along until some reasonable time when Kesler’s problem could be resolved; and that when he signed the contract, it had been his understanding that it was for 1967 only.
On July 18, 1969, interest in the amount of $1,463.52 on the three notes was paid by a check from “Westover Plantations.” There was testimony to the effect that Mr. Brent was connected with this company and that the check was signed by Brent’s secretary. Also on July 18, 1969, the Bank renewed two of Kesler’s past due notes.
On October 31, 1969, the Bank filed its original bill of complaint against Brent and several residents. Kesler was not made a party to that bill. It was alleged that all notes were then past due and owing. On November 11, 1969, Brent, through his attorney, wrote the Bank demanding that the Bank “proceed immediately against Mr. Kesler for the recovery of its debt” and requested a copy of the Bank’s ledger which would reflect its loan account with Kesler.
*434 On April 27, 1970, the Bank executed an F.H.A. “non-disturbance” agreement in favor of Kesler in which the Bank agreed “not to repossess or otherwise disturb” the property of Kesler until December 31, 1970. Brent testified that he did not learn of the execution by the Bank of the non-disturbance agreement until a month later. He stated that not only did he not consent to that renewal, but also that the Bank did not seek his approval of it.
On July IS, 1970, the Bank amended its original Bill of Complaint to include Kes-ler as a defendant.
I
The basic issue presented by appellant’s assignment of errors is whether the contract between the Bank and Brent was one of suretyship or one of guaranty. If this contract be one of guaranty, all other errors urged by the appellant are dispatched save the error considered in section II of this opinion, namely, whether Brent’s liability was discharged by the execution of the F.H.A. “non-disturbance” agreement on April 27, 1970, wherein the Bank agreed “not to repossess or otherwise disturb” the property of Kesler until December 31, 1970. The importance of classification stems from the applicability of Mississippi Code 1942 Annotated section 253 (1956) which provides that a surety is discharged if the creditor fails to sue the principal debtor within a specified period upon being notified in writing to proceed against the principal debtor for the recovery of the debt. Brent gave notice to the Bank on April 8, 1968, that he was cancelling the contract, and the Bank failed to proceed against Kesler within the specified period. Appellant submits that such failure discharges him from any liability.
The distinguishable factors between a contract of guaranty and one of suretyship were considered in Bishop v. Currie-McGraw Co., 133 Miss. 517, 97 So. 886 (1923). In construing a contract to be a contract of suretyship in Bishop, supra, we cited with approval the distinctions enunciated in 28 Corpus Juris, page 890, the predecessor of 38 C.J.S. Guaranty § 6 (1943). To paraphrase and set forth in substance, the distinguishable attributes of a contract of suretyship are as follows: (1) A surety is primarily and directly liable to the creditor on his contract from the beginning ; (2) the undertaking of a surety is made at the same time and usually jointly with that of his principal, and binds him jointly to the performance of. the very contract under which the liability of the principal accrues; (3) the contract of the surety is a direct original agreement with the obligee that the very thing contracted for shall be done- — 1. e., the surety is an insurer of the debt or obligation; and (4) a surety is held to know every default of his principal and is liable without notice. In contrast, a guaranty contract possesses the following characteristics: (1) A guarantor is secondarily liable to the creditor on his contract and his liability is fixed only by the happening of the prescribed conditions at a time after the contract itself is made; (2) the contract of a guarantor is separate and distinct from that of his principal, and his liability arises solely from his own contract, although its accrual depends on the breach or performance of a prior or collateral contract by the principal therein; (3) a guarantor enters into a cumulative collateral engagement, by which he agrees that the principal is able to and will perform a contract which he has made or is about to make, and that if he defaults the guarantor will, on being notified, pay the resulting damages — i. e., a guarantor is an insurer of the ability or solvency of the principal, although this characteristic is not present in an absolute guaranty or a guaranty of payment, but only in a conditional guaranty or a guaranty of collection; and (4) except where the guaranty is absolute, generally the guarantor is entitled to notice of the default of the principal.
We hold that the contract at bar is one of guaranty in that it has the requisite *435 attributes enunciated in Bishop, supra. The contract signed by Brent and the notes signed by Kesler were separate instruments and were executed at separate times, and Brent’s liability arose solely from the execution of his own contract and not from an instrument entered simultaneously with the debtor. The contract expressly provided that Brent’s obligation extended to the debts of Kesler “whether due or to become due, and whether now existing or hereafter arising.” Additionally, the contract was entitled “Continuing Guaranty,” and referred to itself in seven instances as being “this continuing guaranty.” Finally, the evidence, oral and written, abundantly supports the chancellor’s finding as a fact that the parties intended for the contract to be one of guaranty, and we cannot say that the chancellor was manifestly wrong.
The factors enumerated above distinguish the present contract from the contract in Bishop. A further distinguishable factor is that in Bishop the contract expressly provided that “the personal, joint, or several liability of the undersigned shall be and is absolute and unconditional . ” (Emphasis added). The Court held the contract to be one of suretyship because “the said Bishop undertakes and binds himself to pay the debt absolutely and unconditionally, instead of guaranteeing the solvency or ability of Turner to pay.” The contract between Brent and the Bank, on the other hand, has no comparable provision, the most similar being: “It is expressly agreed that this continuing guaranty is absolute and complete ....’’ (Emphasis added). This provision does not state that Brent’s liability is absolute and unconditional as in Bishop; what it does state is that Brent’s continuing guaranty is absolute and complete, which is a far cry from insuring the debt and obligation of Kesler. § 7 of 38 C.J.S. Guaranty (1943) states: “An absolute guaranty is one by which the guarantor unconditionally promises payment or performance of the principal contract on default of the principal debtor or obligor.”
The contract expressly provided that “the Bank shall not be bound to exhaust its recourse against the debtor or other persons or upon the securities it may hold before being entitled to payment from the undersigned of the amount hereby guaranteed.” Since the contract was one of guaranty, and in light of the aforesaid provision in the contract, Brent’s demand to proceed against Kesler was inconsequential.
II
The express provisions of the contract authorized the Bank to grant extensions of Kesler’s debt without notice to Brent. The contract further provided that Brent could cancel the contract by written notice to the Bank. Pursuant to the latter provision, Brent canceled said contract on April 8, 1969. The question which is urged in appellant’s fourth assignment of error is whether Brent’s liability was discharged by the execution of the F.H.A. “non-disturbance” agreement on April 27, 1970, wherein the Bank agreed “not to repossess or otherwise disturb” the property of Kesler until December 31, 1970.
Prior to cancellation, Brent requested the Bank to indulge the debt of Kesler and stated that “Mr. Kesler is getting his financing for this year with the FHA and is number one on the list and has been assured by them that the money will be forthcoming at once.” Shortly after the contract was canceled on April 8, 1969, Brent wrote the Bank that it was his understanding that the Bank would go along for some reasonable time.when Kesler’s problem could be resolved. On July 18, 1969, Brent paid the accumulated interest on Kesler’s debt and the Bank renewed several of the notes. Brent’s demand of November 11, 1969, for the Bank to sue Kesler is without significance since the contract was one of continuing guaranty. Hence, any limitation on the Bank’s power to grant extensions other than those imposed by the contract stems from Brent’s cancellation of said contract.
*436 The contract provided that the “discontinuance (of the continuing guaranty) shall not affect my liability on any debts and/or obligations of the debts then existing nor the liability of any other party in the premises.” The chancellor found and appellant concedes that the issuance of the demand notes on July 18, 1969, was the result of requests made by Brent. In executing the F.H.A. non-disturbance agreement, the Bank was justified in thinking that Brent intended to cancel the continuing guaranty only as to future loans and not as to the debt then existing. For the foregoing reason, we conclude that the sagacious chancellor was correct in determining that the contract was one of guaranty and not one of suretyship, and therefore the decree and judgment are affirmed.
Affirmed.
RODGERS, P. J., and PATTERSON, SMITH and SUGG, JJ., concur.