WOODS–TUCKER LEASING CORPORA-
TION OF GEORGIA,
Plaintiff-Appellee,

v.

Thomas Boyd KELLUM, Sr.,
Defendant-Appellant.

No. 79–3400.

United States Court of Appeals,
Fifth Circuit.
Unit A

March 30, 1981.

Glen W. Hall, Jackson, Miss., for defendant-appellant.

Richard T. Bennett, Jackson, Miss., for plaintiff-appellee.

Before WISDOM, RUBIN and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

In this diversity action, governed by Mississippi substantive law, Thomas Boyd Kellum, Sr., a guarantor, appeals from a district court decision holding him presently liable on his Continuing Guaranty Agreement. Since we find that the district court failed to apply the proper Mississippi U.C.C. provision to this action, we reverse and remand for further proceedings consistent with this opinion.

Durfold, Inc., a Mississippi corporation that was one of the original defendants in this action, is a manufacturer of convertible lounge furniture, primarily for hospital use. Durfold is also engaged in the business of leasing its lounge furniture and television sets to hospitals for use by patients. Between 1972 and 1974, Durfold entered into financing arrangements with Woods-Tucker Leasing Corporation, whereby Woods-Tucker would purchase certain merchandise—normally either *Durfold lounge beds* or television sets—from Durfold or its subsidiary Duo Services, Inc. Durfold would lease this merchandise back from Woods-Tucker and then furnish it to various hospitals by lease. Woods-Tucker required Durfold as lessee to execute an equipment lease setting up monthly installment payments to be made to Woods-Tucker as rent of the equipment sold to Woods-Tucker for subsequent lease back to Durfold. Upon the execution of each equipment lease between Woods-Tucker and Durfold, a security deposit or retained deposit of approximately ten percent of the total cost of that equipment was generally taken by Woods-Tucker. The security deposit or retained deposit was forfeited to Woods-Tucker upon the expiration of the lease term in return for the execution of a bill of sale of the equipment leased.

On May 23, 1974, Durfold executed nineteen leases for the rental of certain lounge-a-bed equipment from Woods-Tucker. The leases were payable monthly over a period of thirty-six months. A ten percent security deposit was taken by Woods-Tucker upon the execution of each of the leases. The first payment was due July 1, 1974, and the final payment on each of the nineteen leases was due June 1, 1977. (At trial these leases were designated Exhibits A through S.) On June 21, 1974, Durfold executed a lease for the rental of one used forklift from Woods-Tucker, payable over a period of thirty-six months. The first payment was taken upon the execution of the lease and no security deposit was taken. The final payment was due on May 20, 1977. (At trial this lease was designated Exhibit T.) Finally, on August 14, 1974, Durfold executed two leases for the rental of certain Zenith Color TV sets from Woods-Tucker, payable over a period of forty-eight months, with three rental payments taken on each of the leases upon their execution and no deposit taken. The final rental pay-

ment was due July 1, 1978. (At trial these leases were designated Exhibits U and V.)[1]

On or about May 23, 1974, former defendant William H. Barbour, Sr. (previously President of Durfold and a member of the Board of Directors of Durfold since March 1970) executed a Continuing Guaranty of Lease to Woods-Tucker, its transferees or assignees, of the leases marked A through T executed by Durfold. Later, on August 14, 1974, Barbour executed a Continuing Guaranty of Lease to Woods-Tucker, its transferees or assignees, of the leases executed by Durfold marked U and V. Also on August 14, 1974, defendant Thomas Boyd Kellum, Sr. executed a Continuing Guaranty of Lease to Woods-Tucker, its transferees or assignees, of the leases executed by Durfold marked U and V.[2] Thus, Barbour guaranteed all twenty-two of the leases executed by Durfold, while Kellum guaranteed only two of the leases. Woods-Tucker Leasing Corporation subsequently assigned for value all twenty-two of the leases to Woods-Tucker Leasing Corporation of Georgia. (Woods-Tucker Leasing Corporation of Georgia will hereinafter be referred to in this opinion simply as Woods-Tucker.)

Durfold defaulted in its payments under the leases and Woods-Tucker originally filed suit on July 26, 1977, against Durfold and Barbour for $241,446.47 on twenty-two leases, and against Kellum for the outstanding balance of $145,348.84 on the two leases that he guaranteed. Woods-Tucker also claimed costs of collection, reasonable attorney's fees and expenses, and costs of court. The answers of all defendants denied the allegations in the complaint, denied that plaintiff was a holder in due course of the leases, and alleged a defense of usury, claiming that the leases were not true leases, but were in fact credit sales transactions charging a usurious rate of interest in viola-

tion of Miss. Code Ann. § 75–17–1 (1972 & Supp. 1980) (formerly codified at Miss. Code Ann. § 36 (1942)).

On March 23, 1978, defendants Durfold and Barbour filed an amended answer asserting a counterclaim against Woods-Tucker. The counterclaim again alleged that the leases designated as Exhibits A through V were in actuality credit sales transactions charging a usurious rate of interest. Defendants claimed the right to the recovery of all principal and interest paid on the "leases," in addition to the right to have all principal and interest that was currently due under any unpaid "leases" forfeited. They prayed for a judgment against Woods-Tucker in the amount of $926,000.00, plus costs of court.

A Settlement Agreement and Mutual Release dated January 30, 1979, was executed by Durfold, Barbour, and Woods-Tucker. Under the agreement, in exchange for dismissing its suit against Durfold and Barbour, Woods-Tucker received a note from Barbour in the amount of $201,500.00 plus interest of one percent per annum, secured by Barbour's stock in Durfold[3] and by a life insurance policy on Barbour's life in the amount of $202,000.00. The note was to be payable in monthly installments of $100.00 per month for thirty-six months commencing on February 1, 1979. Beginning on February 1, 1982, the remaining principal and interest due were to be payable in monthly installments of $1,000.00 each, less the amount of the monthly premium payment due on the life insurance policy on Barbour's life, but in no event to be less than $300.00. Woods-Tucker also received a note from Durfold for $36,000.00 plus interest of one percent per annum. This note was to be payable in monthly installments of $1,000.00 beginning on February

---

1. On September 29, 1976, Durfold entered into an Amendment to the Equipment Leases that revised the monthly payment schedule.

2. Both Barbour and Kellum subsequently executed a Consent of Guarantors and Subordination Agreement agreeing to, among other things, the Amendment to the Equipment Leases that Durfold had entered.

3. The note was secured by Barbour's 2,015 shares of Class B preferred stock in Durfold. The stock had a par value of $100.00 and was nondividend, not interest bearing, and redeemable at par.

1, 1979. The last installment was to contain the principal sum of $1,000.00 plus all interest accrued during the term of the obligation. In addition, Durfold and Barbour dismissed their counterclaim against Woods-Tucker. The Settlement Agreement expressly reserved Woods-Tucker's rights against Kellum. On February 6, 1979, the district court entered an order of dismissal that dismissed with prejudice both Woods-Tucker's action against Durfold and Barbour, and Durfold and Barbour's counterclaim against Woods-Tucker. The instant suit, therefore, remains only against Kellum in the amount of $145,348.84.[4]

On August 8, 1979, Kellum filed a motion requesting the district court to allow him to amend his answer to assert the defenses of (1) payment in full, (2) accord and satisfaction, (3) novation, and (4) relief afforded by Miss. Code Ann. §§ 85-5-1, -3 (1972). The district court, after hearing argument of counsel, granted Kellum leave to amend his answer to allege the defenses of payment in full, accord and satisfaction, and relief afforded by the above specified sections of the Mississippi Code. The district court stated, however, that "the pre-existing defenses involving the issues of holder in due course, usury and leases intended as security are not well taken nor the amended affirmative defense of novation." The trial court ordered "that both the Plaintiff and Defendant shall submit a stipulated memorandum of finding of fact unto this Court and that each side shall also file its own affidavits and memorandum of law no later than noon, Friday, August 17, 1979." This case was tried before the court upon stipulations of fact and memoranda of law. As required by the district court, the parties to this lawsuit have stipulated that the lease agreements are true leases and not credit sales transactions charging a usurious rate of interest and that Woods-Tucker is a holder in due course of the leases. The district

court rejected Kellum's defenses and concluded that Woods-Tucker had not prejudiced its right to collect against Kellum on his Continuing Guaranty. Judgment was entered for Woods-Tucker in the amount of $145,348.84, plus $8,849.00 for attorney's fees and $252.40 for expenses and costs of court.

Kellum argued, both before the district court and before this Court, that the settlement between Woods-Tucker and the other defendants constituted an accord and satisfaction of the original debt to Woods-Tucker and a replacement of that lease obligation with an entirely new debt. This new debt, Kellum claims, is evidenced by the new promissory notes given to Woods-Tucker by Durfold and Barbour. Thus, Kellum contends that since the accord and satisfaction discharged Durfold's original obligation under the leases, Kellum is similarly discharged from his Continuing Guaranty Agreement since his guaranty is strictly collateral to and dependent upon Durfold's principal debt.

■ Kellum is correct in his contention that a guaranty contract is collateral to the principal contract between a creditor and the principal debtor. *Powell v. Sowell*, 245 Miss. 53, 61–62, 145 So.2d 168, 171 (1962). If the principal underlying obligation is extinguished, generally the guarantor's obligation is also extinguished. Consequently, if the Settlement Agreement constituted a discharge of the lease obligation and was given in return for a dismissal of the counterclaim and the undertaking of a new debt obligation, then there would be nothing left of the original principal debt for Kellum to guarantee. Thus, the discharge of the original debt would discharge Kellum's obligation.

■ An accord is an agreement to give and accept something in full settlement of a

---

4. To date, $4,000 in $1,000 monthly payments have been made on the $36,000 note executed by Durfold. In addition, $400 in $100 monthly payments have been made on the $201,500 note executed by Barbour. According to the affidavit of Wilton C. Futch, Vice President of Woods-Tucker, the $4,400 has been applied to Durfold's total indebtedness of $241,446.47, but not to the leases guaranteed by Kellum. Futch specifically stated that all payments received from Durfold and Barbour had been applied to the total indebtedness outstanding on the leases and not to the promissory notes of Durfold or Barbour.

claim. Satisfaction is the execution of the accord, which discharges the old claim. In order to effect an accord and satisfaction, however, the parties must intend that the payments constitute an accord and satisfaction. *Rivervalley Co. v. Deposit Guaranty National Bank*, 331 F.Supp. 698, 708–09 (N.D.Miss.1971). Implicit in the district court's conclusion that the settlement did not discharge the underlying lease obligation and that the new promissory notes were merely additional promises to pay the original debt is the finding that Woods-Tucker did not intend the settlement and mutual release to operate as an accord and satisfaction. This conclusion—that the parties did not intend to effectuate an accord and satisfaction—is not clearly erroneous; indeed, Woods-Tucker's reservation of rights against Kellum clearly indicates that Woods-Tucker did not intend the lease obligation to be discharged. The Settlement Agreement entered into by Woods-Tucker, Durfold, and Barbour expressly provided that "[n]either such dismissal [of the suit against Durfold and Barbour] nor this agreement shall in any manner affect any rights that Woods-Tucker has against Thomas Boyd Kellum, Sr., any such rights, whether in law or equity, being hereby ex-

pressly reserved by Woods-Tucker." The Order of Dismissal entered by the district court stated that, "This Order shall in no way affect the pending suit herein by Woods-Tucker Leasing Corp. of Georgia against the defendant Thomas Boyd Kellum, Sr." Finally, the district court opinion in this case specifically states that: "From an examination of the settlement documentation, including the Order of Dismissal previously entered by this Court, it is clear that the plaintiff reserved its rights against the defendant Kellum before dismissing Durfold and Barbour, and never had any intention of releasing Kellum from his Continuing Guaranty." Moreover, the Vice President of Woods-Tucker testified by way of affidavit that Woods-Tucker did not intend to accept the notes given by Durfold and Barbour as payment or full satisfaction of the obligation due from Kellum. Since the evidence indicates that the new promissory notes were merely additional promises to pay that did not discharge the underlying obligation,[5] the district court's conclusion that there was no accord and satisfaction of the original debt is affirmed.

 The district court held that Miss. Code Ann. § 85-5-1 (1972),[6] which provides

---

5. Even if the settlement had released Woods-Tucker's claim against Durfold on the lease obligation, that would not necessarily release Kellum. Generally, when a creditor releases the principal debtor, the guarantor is released since his obligation is collateral to that of the principal debtor. When a creditor releases the debtor and expressly reserves his rights against the guarantor, however, his claim against the guarantor may be preserved where the release is construed only as a covenant not to sue. Thus, although the creditor's only recourse for payment of the debt is an action against the guarantor, the guarantor's rights against the debtor remain unaffected and the guarantor may still sue the debtor for reimbursement. *See Continental Bank & Trust Co. v. Akwa*, 58 Wis.2d 376, 206 N.W.2d 174 (1973). An analogous situation exists in the instant case since Woods-Tucker dismissed its suit against Durfold and Barbour on the underlying lease obligation with prejudice; consequently, it cannot sue them again on this debt at a later date. Should Kellum be held accountable for the $145,348.84 of the lease obligation that he guaranteed, however, his rights of reimbursement and contribution against Durfold and Barbour

will remain unaffected by the settlement. *See Knight v. Cheek*, 369 A.2d 601, 21 U.C.C.Rep. 206 (D.C.App.1977) (when debtor settled with creditor for less than full amount of debt, guarantor who paid remainder of debt was entitled to reimbursement from debtor on all payments within the statute of limitations period).

6. Section 85-5-1 provides:

In all cases of joint or joint and several indebtedness, the creditor may settle or compromise with and release any one or more of such debtors; and the settlement or release shall not affect the right or remedy of the creditor against the other debtors for the amount remaining due and unpaid, and shall not operate to release any of the others of the said debtors; and all mortgages or securities for the said indebtedness shall remain in full force against the debtors not released, in favor of the creditor, and also in favor of such of the debtors as may be entitled to contribution, payment, or reimbursement from others of said debtors, and the right of payment, contribution or reimbursement, as among themselves, shall not be affected by this section; and if any debtor, so released, shall

that a creditor may settle with and release one debtor without affecting his right to hold another joint or joint and severally

> have paid more than his ratable share of the whole debt, the whole amount paid by him shall be credited, and if less than his ratable share shall be credited, and the other debtors shall be liable for the residue.

7. It is clear that Kellum and Barbour are jointly and severally liable as guarantors of Durfold's debt. That relationship is specifically designated in the Continuing Guaranty Agreement:

> In consideration of the above designated leases . . . , which lease is made by Lessor at the request of the undersigned and in reliance on this Continuing Guaranty of Lease, the undersigned (*if More than one, then jointly and severally*) guarantee(s) to Lessor, its transferees or assignees, the prompt payment of all rent to be paid by Lessee . . . as well as the performance by Lessee of all the terms, conditions, covenants and agreements of the said lease . . . .

(emphasis added). Moreover, under Mississippi jurisprudence, guarantors who jointly execute an agreement of guaranty are equally liable on the agreement. *Enochs & Flowers, Ltd. v. Roell*, 170 Miss. 44, 55, 154 So. 299, 302 (1934).

Although the status of the relationship between Kellum and Durfold is not as clear as that of Kellum and Barbour, it appears that Kellum is also jointly and severally liable with Durfold. It is true that Kellum, as guarantor, is only secondarily liable while Durfold, as the principal debtor, is primarily liable to the creditor. *Brent v. National Bank of Commerce*, 258 So.2d 430, 434 (Miss.1972). Consequently, Kellum's liability does not attach until certain conditions are fulfilled, *i. e.*, Durfold fails to pay its rent to Woods-Tucker when it is due or fails to perform any other term, condition, covenant, or agreement of the lease. Indeed, traditionally one distinction drawn between a contract of suretyship and a contract of guaranty is that "[t]he contract of suretyship is the joint and several contract of the principal and the surety; the contract of the guarantor is his own separate undertaking, in which the principal does not join." 38 Am.Jur.2d *Guaranty* § 15, at 1012 (1968) (footnote omitted).

> While the contract by which one is bound as surety engages the responsibility of the surety jointly with that of the principal, the guarantor's obligation is separate from and independent of the undertaking of the principal debtor. The surety may be joined with his principal in an action to enforce the obligation by which both are equally bound, whereas it is generally held that a guarantor, being bound by a contract which is independent of the obligation of the principal debtor, may not be joined as a party to an action against the latter unless his joinder has been authorized by statutory enactment.

liable debtor for the amount due and unpaid, was controlling in this case. That this statute applies to the instant situation[7]

*Id.* at 1013 (footnotes omitted). If a guaranty is absolute or unconditional, however, so that the liability of the guarantor becomes fixed immediately upon the default of the debtor, it is generally indistinguishable from a contract of suretyship and one suit against the guarantor and the principal debtor may be allowed. Annot., 53 A.L.R.2d 522, 525 (1957). Thus, after maturity of the debt and default by the principal debtor, an absolute guarantor is equally liable with the principal debtor, and in some states at least, their liabilities are joint and several.

It is this Court's considered opinion that a Mississippi court would find a principal debtor and an absolute guarantor jointly and severally liable and would allow a common suit against them. In *McConnon & Co. v. Prine*, 128 Miss. 192, 90 So. 730 (1921), the Mississippi Supreme Court allowed a single suit to proceed against two guarantors and the principal debtor. The court stated:

> Ordinarily, the contract of guaranty is separate from that of the principal debtor, and where the contracts are separable and made on different considerations a joint action could not be maintained; but where all are primarily responsible and where the liability of each springs out of the same act, the fact that the obligation of the different defendants may be evidenced in a different manner would not prevent suit from being maintained against them jointly and severally, nor would it make the causes of action separate and distinct.

*Id.* at 201–02, 90 So. at 732. In Mississippi, therefore, after default by the principal debtor, an absolute guarantor is jointly and severally liable with the debtor, at least where their liability "each springs out of the same act."

Kellum's guaranty is an absolute guaranty. "The nature and extent to which a guarantor is liable depends upon, and may not be extended beyond the terms of the agreement." *Shur-Gain Feed Div. William Davies Co. v. Huntsville Prod. Credit Ass'n*, 372 So.2d 1317, 1320 (Ala.Civ.App.1979). Here, Kellum's liability, at least as to $145,348.84 of Durfold's debt, is coextensive with that of the principal debtor Durfold. Kellum unconditionally agreed to pay Durfold's debt at maturity if Durfold failed to do so, irrespective of whether Woods-Tucker first pursued its remedy against Durfold. *See Anderson v. Trade Winds Enterprises Corp.*, 241 So.2d 174, 177 (Fla.Dist.Ct.App.1970) ("Where the guaranty is absolute, the guarantor becomes liable upon non-payment by the principal, and the person in whose favor the guaranty runs has no duty to first pursue the principal before resorting to the guarantors."). Upon default by Durfold, Woods-Tucker can

does not, however, completely dispose of this case. Here, although Woods-Tucker may not have affected its right to hold Kellum liable for the amount remaining due and unpaid, there is no part of the debt that is presently due since the tendering of promissory notes by Durfold and Barbour suspended the obligation under the leases. Miss. Code Ann. § 75–3–802 (1972).[8]

■ The district court incorrectly held Miss. Code Ann. § 75–3–802 to be inapplicable to this case.[9] This section "states the legal effects on [an] underlying obligation when one takes a negotiable instrument for that obligation." J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 13–20, at 540 (2d ed. 1980). Section 75–3–802(1) applies when a creditor accepts a negotiable instrument as conditional payment for an underlying obligation. Here, Woods-Tucker accepted two negotiable promissory notes as conditional payment for the underlying debt obligation evidenced by the leases. Subsection (a) is inapplicable to this case because it applies only when "a bank is drawer, maker or acceptor of an instrument, and there is no recourse from the instrument against the

underlying obligor." Miss. Code Ann. § 75–3–802 (1972).

In all other situations, in the absence of a contrary agreement, when an obligee takes a negotiable instrument which is tendered in payment of a promise to pay money, the obligor is not discharged on the underlying promise of payment until the second instrument itself is paid; once the second instrument is due, the first instrument is revised. The failure to pay on the second instrument gives rise to a cause of action on either instrument. *First Pennsylvania Bank v. Triester,* 251 Pa.Super. 372, 380 A.2d 826, 830 (1977) (footnote omitted).

In the instant case, the leases represented an obligation on behalf of Durfold to pay money to Woods-Tucker. The promissory notes of Barbour and Durfold were "tendered in payment of a promise to pay money." It appears that Woods-Tucker neither expressly nor impliedly agreed to accept the promissory notes as absolute payment of the obligation; rather, they were accepted only as conditional payment. According to the terms of the statute, therefore, the lease obligation is suspended until the new promissory notes are due and in default.[10]

---

sue any of the parties separately or all of them together at its option. Thus, their liability is joint and several.

Insofar as Kellum only guaranteed $145,-348.84 of Durfold's entire $241,446.47 debt, Kellum is jointly and severally liable with Durfold and Barbour only to the extent of $145,-348.84. *Cf. American Bank & Trust Co. v. Blue Bird Restaurant & Lounge, Inc.,* 290 So.2d 302 (La.1974) (Under guaranty of first $20,000 of note for $91,207.89, guarantor and principal debtors were, as to first $20,000, obliged to the same thing and each could be compelled for the whole and thus the obligation incurred by the guarantor was solidary). Indeed, the parties expressly stated in their Stipulation of Facts that: "It is further stipulated that the $145,-348.84 sought from Kellum is a joint and several liability as evidenced by the two leases (#3594–3 and #3595–2) and Continuing Guaranty of Mr. Kellum."

8. Section 75–3–802 provides, in pertinent part:
 1. Unless otherwise agreed where an instrument is taken for an underlying obligation, (a) the obligation is pro tanto discharged if a bank is drawer, maker or acceptor of an instrument, and there is no recourse from the instrument against the underlying obligor; and

(b) in any other case, the obligation is suspended pro tanto until the instrument is due or if it is payable on demand, until its presentment. If the instrument is dishonored, action may be maintained on either the instrument or the obligation; discharge of the underlying obligor on the instrument also discharges him on the obligation.

9. Section 75–3–802 is only applicable to negotiable instruments, and so is not applicable to Kellum's guaranty contract itself, which is not negotiable. Thus, its provisions were not triggered when the Continuing Guaranty was executed. *See EAC Credit Corp. v. King,* 507 F.2d 1232, 1238 (5th Cir. 1975). But when, pursuant to the Settlement Agreement, negotiable instruments were given for the existing debt, the Mississippi U.C.C. provision did become applicable. *See Brown v. Coastal Truckways, Inc.,* 44 N.C.App. 454, 261 S.E.2d 266, 28 U.C.C.Rep. 3, 5 (1980) (U.C.C. provision applicable where negotiable instrument was offered in payment of disputed underlying obligation involving employment contract).

10. In his affidavit, the Vice President of Woods-Tucker stated that the promissory notes

At that time, the right to sue on the underlying obligation is revived, and Woods-Tucker will have the option to sue on the new promissory notes or on the lease obligation.[11] Since Durfold's principal obligation was not discharged, but instead was simply suspended, Kellum's obligation pursuant to his Continuing Guaranty was not discharged either; it too was suspended. Kellum cannot be held liable on his guaranty until Durfold's principal debt becomes due and remains unpaid. Durfold's principal debt cannot come due until there is a failure to pay on the new promissory notes tendered by Durfold and Barbour, and it is not until that time that Kellum's obligation arises and that Woods-Tucker can sue Kellum if, on demand, he fails to pay the $145,348.84 that he guaranteed. If, as alleged by the Vice President of Woods-Tucker, the promissory notes given by Durfold and Barbour are presently in default, then Durfold's underlying obligation on the leases has been revived and Kellum is presently liable on his guaranty.

The suspension of the original obligation until such time as the new promissory notes become due and fail to be paid provides an extension of time for Durfold to pay its debt to Woods-Tucker. Generally, a material alteration in the principal obligation, such as an extension of time, discharges a guarantor who has not consented to such a change. *See Tower Underwriters, Inc. v. Culley*, 211 Miss. 788, 799, 53 So.2d 94, 98 (1951) (" 'The guarantor is released or discharged of liability if, without his consent, the contract of obligation by which the principal debtor is bound to the creditor or obligee has been materially altered in respect of its terms or the manner of execution thereof.' ") (quoting 24 Am. Jur. *Guaranty* § 80 (1939)). Here, however, the alteration does not serve to discharge Kellum because in the Continuing Guaranty Agreement that he signed, Kellum consented to any extensions of time that Woods-Tucker might grant to Durfold.[12]

Although the district court correctly held that Woods-Tucker's rights against Kellum had not been relinquished and that Kellum had not been discharged by the Settlement Agreement, it apparently entered judgment against Kellum before his present obligation under his Continuing Guaranty became due. Upon remand of this case to the district court, the trial court should determine whether or not the promissory notes are presently in default. If they are not, this case against Kellum should be dismissed without prejudice to the reinstitution of suit at such time as the notes might become due and unpaid. If they are presently in default, the district court should take further actions consistent with this opinion.

**REVERSED AND REMANDED.**

---

given by Durfold and Barbour are presently in default. Under the trial court's disposition of this case, no significance was attached to this statement.

11. Of course, Woods-Tucker cannot sue Durfold or Barbour on the lease obligation since its prior suit against those parties was dismissed with prejudice.

12. The language of the Continuing Guaranty states:

The undersigned waive notice of acceptance hereof, presentment, demand, protest, division and discussion, notice of protest or of any defaults, and of notice of any act to establish the liability of any party on any commerical [*sic*] or other paper, indebtedness or obligation, and consent(s) that the Lessor, its transferees or assignees, *may without affecting the obligation hereunder, grant the Lessee any extension* or indulgency under the lease . . . .
(emphasis added).

Even in the absence of Kellum's consent to an extension of time, Woods-Tucker's express reservation of rights against Kellum might suffice to prevent a discharge of Kellum.