**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff–Appellee,**

v.

**James M. INHOFE, an individual, Defendant–Appellant.**

No. 92–5141.

United States Court of Appeals, Tenth Circuit.

Feb. 8, 1994.

372

C. Allen Foster, of Patton, Boggs & Blow, Greensboro, North Carolina (Eric C. Rowe of Patton, Boggs & Blow, Greensboro, North Carolina, and Lee I. Levinson, Tulsa, Oklahoma, with him on the briefs), for Defendant–Appellant.

Sidney G. Dunagan (John Henry Rule, on the brief), of Gable & Gotwals, Tulsa, Oklahoma, for Plaintiff–Appellee.

Before EBEL, SETH, and KELLY, Circuit Judges.

SETH, Circuit Judge.

This is an appeal from a summary judgment for the Federal Deposit Insurance Corporation (FDIC) in an action brought by the FDIC (which had taken over the Bank of Commerce and Trust of Tulsa in May of 1986) against Mr. James M. Inhofe on his guaranties of obligations of a defunct borrower of the Bank, Quaker Life Insurance Company. The judgment was for about $663,500.

. The FDIC Complaint sought recovery under the guaranties by Inhofe on the notes and leases for the balances due from Quaker. A claim for attorney fees provided in the note or notes is also asserted.

The basic issues on appeal center on a "Settlement Agreement", signed by the FDIC and the Oklahoma State Receiver of Quaker. This recited the parties' intent to thereby resolve all their disagreements. The guarantor, the Defendant herein, was not a party to the Agreement nor mentioned by name therein, nor was his particular relationship to the subject matter stated. It is necessary to describe at some length the evolving relationships of the several participants and the conclusion thereof.

As mentioned, this litigation developed from a financial transaction involving a borrower (Quaker), a lender (the Bank), and a guarantor (Inhofe). It continued with the borrower's changing obligations to the lender. The guaranties of Inhofe were continuing ones. *See Rucker v. Republic Supply Co.*, 415 P.2d 951 (Okla.). The relationships among the three were initially created and controlled by several promissory notes, some lease obligations, and by several guaranty agreements of the notes and lease obligations. The obligations on the notes changed as time went on.

However, the Bank failed on May 8, 1986 and the borrower Quaker failed on August 6, 1986. With the failure of the Bank the FDIC succeeded in one capacity to the Bank's position as liquidator and in its other capacity as purchaser of the Bank's assets. An Oklahoma State Receiver took over the position and assets of the borrower, Quaker, upon its failure. Inhofe remained as guarantor of Quaker's obligations. After the failures these relationships were *initially* controlled by the same instruments except, of course, the obligations of Quaker were delinquent—both as to the lease payments and on the notes. Inhofe's obligation remained the same.

Quaker, in addition to the guaranties by Defendant of the note and leases of Quaker, had put up as collateral to the Bank a group of notes receivable from third parties payable to Quaker. The Bank apparently held a perfected security interest in these notes (although this is disputed by the FDIC). The total face amount of the notes was over one million dollars. The handling of this collateral is an issue in the case.

The FDIC–Receiver relationship was however changed when they each signed what was titled "Settlement Agreement" in May 1987. This Agreement recited as its purpose (after describing some disagreements between the parties):

> "WHEREAS, the parties hereto desire to resolve all matters of controversy between them in an expeditious and cost-effective manner consistent with the best interests of the insolvent estate represented by these parties; ...."

Before the above quoted paragraph the following is a recitation of disagreements:

> "WHEREAS, the FDIC has made a claim against the Quaker receivership estate for indebtedness incurred by Quaker to the Bank on account of a certain promissory note no. 74716, and a certain personal property lease no. 1120, and;

> "WHEREAS, Quaker's Receiver disputes the FDIC's claim, challenging the propriety of an offset made by the FDIC of a certain deposit account owned by Quaker at the Bank, and;

> "WHEREAS, Quaker's Receiver has elected to disaffirm the executory portion of said property lease no. 1120, and...."

The FDIC had filed in January 1987 with the Receiver of Quaker a verified claim for the amount due from Quaker to the Bank on the stated note as $316,000. The FDIC had taken possession of the notes and guaranties here concerned. The FDIC claim also included an amount asserted to be due on the lease obligation.

The disagreements were thus "settled" by the execution of the mentioned "Agreement" by the FDIC and by the Receiver dated May 15, 1987. The Agreement was approved by the Oklahoma state court handling the receivership.

As mentioned, the FDIC had filed a claim in the Quaker receivership. The amount of this claim was the balance due on the $300,-000 note of Quaker to the Bank (this note had accumulated the obligations on previous notes), and included the amount due the Bank on the leases undertaken by Quaker. This claim was for $316,000 on the note (including interest) and $145,000 due on the leases. These were the obligations guaranteed by the Defendant Inhofe.

The Agreement however recited that the "approved" claim would be for $461,987.48. This was a significant element in the Settlement Agreement. The Receiver of Quaker therein agreed to approve it as an unsecured claim. This was done. The amount recited therein, as mentioned, was $461,987.48 and was followed by this significant statement:

"... which is an amount equal to the total liability on account of said promissory note and lease owed by Quaker to the FDIC as of August 6, 1986."

The Agreement also covered the lease obligations of Quaker, and the FDIC agreed thereby to convey to Quaker all the personal property covered by described leases. The Receiver elected to disaffirm the executory portion of the leases.

The guarantor-Defendant Inhofe's basic arguments have been that the Settlement Agreement was an accord and satisfaction to discharge Quaker's liability on the notes, and his guaranties as well. He also asserts that *if there was not* an accord and satisfaction, the guaranties followed each conversion of Quaker's underlying obligations, and, when this suit was filed in 1990, these were only in the Settlement Agreement. He argues the obligations were no longer in the note and leases, but had been *replaced* by the Agreement some three years before this suit started. Thus Inhofe urges that the FDIC has here sued on the notes and leases which were supplanted by the Agreement, and that the FDIC could not go back in time and to the previous forms of the obligations, and select a particular one (or several) which had been superseded.

The FDIC did not sue the Quaker Receiver on the notes and leases, and has apparently relied on its claim. There is no question that the guaranties intended to be and were continuing. The Complaint herein describes them as continuing. This intent is clearly expressed in each of the several guaranties. The trial court in its Memorandum Opinion and Order of April 17, 1992 (Exhibit 15) determined that the two continuing guaranties (August 12 and November 22) were essentially the same. The trial court stated:

"By its own terms the August 12 guaranty is 'absolute, unconditional and continuing.' In ¶A of the guaranty agreement Mr. Inhofe 'guarantee[d] to the Lender that Debtor [Quaker] will fully and promptly pay and discharge all indebtedness upon which Debtor now is or may hereafter, from time to time, become obligated to Lender either as principal, guarantor, endorser, or in any other capacity....' On

November 22, 1985, Mr. Inhofe executed a second continuing guaranty contemporaneously with the extension of new credit from the Bank to Quaker. In all relevant respects, the November 22 guaranty contains precisely the same language as that quoted above from the August 12 guaranty."

The significant portion of the guaranties quoted above as to the issues before us is the portion whereby Inhofe guarantees that he will discharge all indebtedness upon which Quaker may now or hereafter be obligated to the Bank "either as principal, guarantor, endorser, or in any other capacity." The phrase *in any other capacity* is all-inclusive.

*The Reservation of Rights Issues and the Settlement Agreement*

As mentioned, the Defendant urges that the Settlement Agreement was an accord and satisfaction to discharge all the then existing obligations *on the note and leases*. An accord and satisfaction under Oklahoma law has been defined in *Gasper v. Mayer,* 171 Okla. 457, 43 P.2d 467, 472 as follows:

"An accord is an agreement whereby one of the parties undertakes to give or perform, and the other to accept in satisfaction of a claim, demand, or debt, either liquidated or unliquidated and unadjusted, and arising either from contract or tort, something other than or different from what he is or considers himself entitled to, and a satisfaction is the execution of such agreement. Accord and satisfaction, then, is the substitution of another agreement between the parties in satisfaction of the former one, and an execution of the latter agreement.... It is a substitution by agreement of the parties of something else in place of the original claim."

*See also Transpower Constructors v. Grand River Dam Authority,* 905 F.2d 1413 (10th Cir.).

█ A "settlement" between a creditor and a debtor to be an accord and satisfaction must be intended to discharge all the *obligations created by* the original agreement or agreements. Thus here the intent must be found to demonstrate such a *discharge* of the obligations of Quaker, then represented by the note and the leases, before an accord and

satisfaction can be established. This, in our view, cannot be done.

The parties argued the "reservation of rights" element of the accord and satisfaction doctrine. The applicable cases hold that an express reservation of rights to the lender against the guarantor in a settlement agreement prevents the agreement with debtor from being an accord and satisfaction. Also, the cases hold if there was no reservation of rights the agreement *could be* an accord and satisfaction absent a waiver. The mere absence of a reservation of rights provision does not necessarily make the Agreement before us an accord and satisfaction.

In *Woods–Tucker Leasing Corp. v. Kellum,* 641 F.2d 210 (5th Cir.), the court held that an express reservation of rights against the guarantor barred the settlement from being an accord and satisfaction. The same holding in substance appears in *Resolution Trust Corp. v. Bildman,* 768 F.Supp. 3 (D.D.C.). *See also Oil Field Gas Co. v. International Supply Co.,* 187 Okla. 262, 103 P.2d 91, and Restatement of Security § 122. In Oklahoma the rights of guarantors and of sureties are the same. *Lum v. Lee Way Motor Freight,* 757 P.2d 810 (Okla.).

It is significant that the parties in the Agreement recite the actual amount of the claim of the FDIC against the Quaker estate to be approved by the Receiver, *and how this figure was determined.* The Agreement thus states, as mentioned above:

"3. Quaker's Receiver shall approve, an unsecured, general claim against Quaker's receivership estate in the amount of Four Hundred Sixty–One Thousand Nine Hundred Eighty–Seven and 48/100 Dollars ($461,987.48), which is an amount equal to the total liability on account of said promissory note and lease owed by Quaker to the FDIC as of August 6, 1986."

(August 6, 1986 was the date Quaker's Receiver was appointed.) The Agreement continues:

"4. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, and their respective successors, if any; no other party is intended to, nor shall it, derive any benefit from the terms of this Agreement."

["N]o other party is intended ... to derive any benefit" is argued by the FDIC to be a "reservation of rights which would prevent the Agreement from being an accord and satisfaction. We do not consider that it is necessary to decide this point. The matter is decided by a more fundamental doctrine— the intent of the parties. This was to do no more than make another change in the source of underlying obligations.

The trial court considered paragraph 4 (above) of the Agreement and concluded on a more fundamental basis:

"Because the agreement by its own terms indicates that the parties did not intend for the agreement to benefit any other party potentially liable for Quaker's debt, it is obvious that the parties did not intend to fully discharge the underlying debt. Therefore, the 'Settlement Agreement' is not an accord and satisfaction. *See Woods–Tucker Leasing Corp. v. Kellum, supra,* 641 F.2d at 214, and *RTC v. Bildman, supra,* 768 F.Supp. at 5."

We also conclude that the Agreement did not discharge the underlying obligation of Quaker. There was no such intention. *See Transpower Constructors v. Grand River Dam Authority,* 905 F.2d 1413 (10th Cir.). We do not rest the conclusion on the "not intended to benefit others" clause in the Agreement. Our view of the Agreement as a whole, especially with the continuation of the dollar amounts, shows that the purpose was to change the supporting source and documentation to other than the existing leases and the last note. It was instead to be evidenced by the provisions of the Agreement, including the verified claim of the FDIC approved by the Receiver.

We must reach this conclusion although there is nothing in the Agreement itself *expressly* substituting the approved claim (or other particular undertaking except perhaps as to the leases) for the last note of the series. The actions of the parties in carrying out the Agreement, in the transfer of the dollar amounts, and in their abandonment of preexisting remedies, demonstrate that the underlying obligations were removed from

the old sources and were to continue in a new form.

The Agreement itself *continued* the underlying obligations, but it necessarily changed their form documentation, that is, the way they were to be represented with a new legal basis for the same dollars. The structure of the Agreement shows how they were to be continued. The implementation of the intent to carry out the underlying obligation is contained in the structure of the Agreement, as a whole, and is evidenced by an examination as to how the parties carried it out over a period of several years. The time span is significant.

■ We must depart from the ultimate result reached by the trial court, which held in substance that the guaranties remained "attached" to the note or notes and the leases, and conclude instead that, at the time suit was filed, the guaranties no longer pertained nor were applicable to the note and leases because they had moved on to something else. The possible changes contemplated by the wording of the guaranties were virtually unlimited. Thus, as quoted above, they were applicable to the indebtedness of Quaker at any time either as "principal, guarantor, endorser, or *in any other capacity*." The guaranties of the Defendant at the time of this suit thus no longer "attached" or related to the note or notes nor to the lease obligations of Quaker.

### The Complaint Filed by the FDIC Herein

The Complaint against the guarantor in this action was based only on the last note of Quaker to the Bank and the leases. It was filed in 1990. The FDIC had taken over the Bank in May 1986. The Agreement was made in May 1987. The FDIC had theretofore taken no legal action on the notes or leases, as such, against Quaker nor anyone else. We must examine the consequences of the movement of a continuing guaranty, as above described, when the suit is brought on the evidences of debt which have been supplanted by the continuation of a continuing guaranty.

The Oklahoma court in *Rucker v. Republic Supply Co.*, 415 P.2d 951, followed a continu-

ing guaranty as the obligation underwent the changes from an open account, then a note, and finally a judgment. The Fifth Circuit in *Woods–Tucker Leasing Corp. v. Kellum*, 641 F.2d 210, held that a suit on an original liability could not proceed so long as notes substituted for the original obligation were enforceable. *See Meacham v. Okla. Bank & Trust Co.*, 600 P.2d 868 (Okla.App.); *Founders Bank & Trust Co. v. Upsher*, 830 P.2d 1355 (Okla.) (referring however to 15 O.S. 1981 § 334). *See also Iola State Bank v. Biggs*, 233 Kan. 450, 662 P.2d 563.

The authorities, although somewhat limited, hold that as the continuing guaranty proceeds as intended, it leaves behind entirely the supplanted documentary basis.

### The Collateral

Attached to the Complaint herein filed February 2, 1990 is a formal demand letter by the FDIC to the Defendant dated January 4, 1990. The demand was thus several years after the FDIC took over the Bank.

During this time, from the date the FDIC took over the Bank until the Complaint, the *collateral* provided originally by Quaker to the Bank to support the loan, and apparently to be used to liquidate the loan, became worthless. The FDIC made no effort to resort to this collateral. The Defendant urges that the FDIC in permitting the collateral to become worthless violated the Oklahoma doctrine of good faith. This is advanced as a separate defense, but we do not reach this issue as such. Instead, this abandonment of collateral, together with the fact no action was taken by the FDIC against Quaker to collect on the note itself, or the collateral, shows that the FDIC must have also been following the ambulatory guaranty. In our view, a consideration of the handling of the collateral is a separate defense, but we need not reach the issue.

We thus must conclude that no cause of action was asserted against the Appellant on the guaranties of the note (or notes) or leases as alleged in the Complaint therein.

The judgment of the district court is RE-VERSED.